IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

BARRY SCHMITTOU )
)
v. ) No. 3:05-0013
) Judge Trauger/Bryant
METROPOLITAN LIFE INS. CO., ET AL. )

To: The Honorable Aleta A. Trauger, District Judge

**REPORT AND RECOMMENDATION**

I. INTRODUCTION

This civil action is brought pursuant to section 502(e) of the Employee Retirement Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"). Plaintiff, proceeding pro se and in forma pauperis, filed his complaint on January 6, 2005 (Docket Entry No. 1). On December 9, 2005, defendants Metropolitan Life Insurance Company ("MetLife") and TMG Solutions, Inc. ("TMG") filed under seal a copy of the administrative record (Docket Entry No. 45). On October 5, 2006, the case was reassigned to the undersigned Magistrate Judge for further proceedings on nondispositive matters (Docket Entry No. 74).

On January 25, 2007, the undersigned authorized limited discovery requested by plaintiff (Docket Entry No. 80), and on April 23, 2007, a scheduling order directing the parties to file their respective cross-motions for judgment on the administrative record was entered (Docket Entry No. 90). Those motions were

1

duly filed (Docket Entry Nos. 97, 99) and responded to (Docket Entry Nos. 104, 105), and are currently pending. For the reasons given below, the undersigned recommends that defendant's motion for judgment be **GRANTED in part** and **DENIED in part**; that plaintiff's motion for judgment be **GRANTED in part** and **DENIED in part**; that MetLife's decision to deny short-term disability ("STD") benefits under the "Actively at Work" provision of that plan be **AFFIRMED**; and, that MetLife be **DIRECTED** to consider the merits of plaintiff's claim for long-term disability ("LTD") benefits.

## II. BACKGROUND

The record[1] reveals the following facts comprising the medical and vocational histories underlying plaintiff's disability claims:

Plaintiff worked for TMG as a National Field Manager until July 6, 2001, when his employment was terminated for reasons related to his job performance (AR 4, 253). In January 2001, plaintiff had begun to experience irregular visual symptoms in his right eye (AR 90). In February 2001, plaintiff had received a commendable performance evaluation and a raise. Id.

---

[1] Citations to the administrative record are designated in this report by the abbreviation "AR". Defendants' submission of the administrative record includes copies of the STD and LTD plans, citations to which are designated by the abbreviation "SPD".

2

From mid-March to early July, 2001, plaintiff complained of progressively worsening visual symptoms, first to his health care providers and then to his managers at TMG. Id. On July 2, 2001, plaintiff sent an e-mail to his managers detailing his symptoms and medical treatment, and requesting two days of unpaid medical leave (AR 99-102). On July 3, 2001, plaintiff sent an e-mail to his manager informing her of his upcoming doctor visits, in which he also mentioned "a formula that is used to determine abilities and disabilities" and asked whether he should file a claim for workers' compensation (AR 103). On July 6, 2001, plaintiff was fired. It was not until April 27, 2002, that plaintiff filed a form with MetLife reflecting his claims for STD and LTD benefits, based on complaints of "sharp eye pain, image jumps, double vision, [and] loss and reversal of words & letters." (AR 210) MetLife is the insuror of STD and LTD plans that had issued to TMG for the benefit of its employees, and claims under those plans are likewise administered by MetLife (SPD 30, 50).

The medical and other evidence of record is summarized in defendants' memorandum (Docket Entry No. 98 at 3-6) as follows:

> In connection with his claim, Schmittou submitted an attending physician statement by Dr. Jeffrey C. Jessup, an optometrist. (AR 208-09) Dr. Jessup diagnosed Schmittou with diplopia (double vision) and convergence insufficiency. (AR 208) Dr. Jessup left the "physical capabilities" section of the form blank, stated that he had advised Schmittou to return to work, but that he should limit reading or nearwork to three

3

hours per day.  (AR 209)

In an accompanying letter apparently prepared in connection with a workers' compensation claim, Dr. Jessup explained Schmittou's medical history in some detail.  (AR 211-13)  Dr. Jessup noted that Schmittou had been diagnosed with a pigmented choroidal lesion (a small growth in the retina) in his right eye in March 2001.  (AR 211)  Schmittou's visual acuity was 20/20 in that eye, but with a subjective "blur."  (*Id.*)  On July 9, 2001, after Schmittou's termination, Dr. Jessup noted that Schmittou's right eye unaided visual acuity was 20/25, and he advised Schmittou to limit close work and reading.  (AR 211-12)

In September 2001, examination revealed that the right retinal lesion "was essentially unchanged," and a recommendation of continued follow-up was made.  (AR 212)  In October and November, Dr. Jessup conducted a battery of tests to determine whether Schmittou's subjective complaints were caused by the lesion or by complications of poor binocular visual skills.  (*Id.*)  Visual fields testing revealed a slightly enlarged blind spot in the right eye, but no other abnormality.  (*Id.*)  Binocular vision tests revealed low fusional reserves (a measurement of how much stress the convergence and divergence mechanisms of the eyes are able to cope with when placed under stress), a treatable condition.  (*Id.*)

Writing in February 2002, Dr. Jessup concluded, "In summary, this patient has a cho[r]oidal nevus of suspicious nature in the right eye which is being monitored."  (*Id.*)  In Dr. Jessup's view, Schmittou's subjective complaints "are nearly always remediable by specific lenses, exercises, and programmed activities," for which Schmittou had been referred to an orthoptist [, "along with appropriate adjustment of required visual demands in terms of size, working distance, lighting, and length of time required undergoing the activities in question."]  (AR 213)

Schmittou additionally submitted the results of a workers' compensation claim, which had been denied.  (AR 214)  The State observed that, in March 2001, Schmittou's doctors did not take him off work or place him under work restrictions; in fact, they simply recommended documenting the lesion and following him closely for signs of change.  (AR 216)  The State further noted that there was no credible medical evidence to support Schmittou's claim that he had suffered a mental injury.  (AR 217)

4

On May 2, 2002, Schmittou submitted a new claim statement, now complaining of mental illness. (AR 241) In support of this claim, Schmittou presented an attending physician statement by Susan B. Carpenter, a psychologist. (AR 239-40) Dr. Carpenter remarked that Schmittou was unable to deal with time pressure, quotas, or interpersonal conflict, and "would require unusually supportive supervisor at this time." (AR 240) Dr. Carpenter noted, however, that she had not advised Schmittou to cease work at TMG because she had not begun seeing him until four months after his termination. (AR 239) In an accompanying letter, Dr. Carpenter stated:

> If Mr. Schmittou had been employed at the time of our initial session, I can imagine I would have recommended a brief mental leave of absence. He was agitated, had limited impulse control, was distrustful of management with passive thoughts of revenge. If the symptom picture was the same in July 2001, as reported by Mr. Schmittou, and if he had consulted a mental health professional at that time, I suspect that professional would have recommended a leave of absence.

(AR 250)

MetLife determined to deny the claim, and Schmittou appealed. (AR 7,8; Docket Entry No. 63, Exh. A; AR 87-104) In addition to a lengthy narrative setting forth his complaints, Schmittou submitted office notes from Dr. Jessup and letters from Drs. Everton L. Arrindell and R. Trent Wallace, retinal specialists to whom Dr. Jessup had referred Schmittou. (AR 106-07, 111, 115-25) Dr. Jessup's records note Schmittou's subjective complaints, and contain the testing results described in his letter of February 1, 2002. (AR 107-11, 115-22, 124-25) Dr. Wallace's letter of December 23, 2002 – written some eighteen months after Schmittou's termination from TMG – indicates that Schmittou had undergone transpupillar thermal laser therapy to remove the choroidal lesion in the latter part of the year. (AR 111) "Prior to treatment," Dr. Wallace wrote, "I explained to Mr. Schmittou that there would probably be a considerable decrease in his vision with the laser therapy and he was understanding of this." (*Id.*) As a result of the 2002 treatment, Schmittou's vision dropped to 4/200 in the right eye. (*Id.*)

MetLife referred these materials for review by

5

independent physician consultant Dr. Gary P. Greenhood, who is board-certified in internal medicine. (AR 14-15, 262-63) Dr. Greenhood opined that, while Schmittou's right-sided visual acuity and visual field were relatively normal in 2001, it was certainly probable that the retinal lesion caused blurred vision. (AR 262) Dr. Greenhood concluded, however, that Schmittou had only a mildly abnormal right-sided visual field prior to the transpupillary therma-therapy, which would not be expected to limit reading and near-vision to 3-4 hours per day. (AR 263).

### III. DISCUSSION

#### A. *Standard of Review*

In light of the provision to MetLife of "discretionary authority to interpret the terms of the Plan[s] and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan[s]" (SPD 31, 53), this Court reviews MetLife's determinations under the arbitrary and capricious standard. E.g., McCartha v. National City Corp., 419 F.3d 437, 441 (6th Cir. 2005). Under this standard of review, MetLife's decision to deny plaintiff's claims will pass muster if that decision is rational in light of the plans' provisions. Id. (quoting Marks v. Newcourt Credit Group, Inc., 342 F.3d 444, 456-57 (6th Cir. 2003)). The Sixth Circuit has elsewhere described the arbitrary and capricious standard of review as requiring that the decision be upheld "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Glenn v. MetLife, 461 F.3d 660, 666 (6th Cir. 2006)(quoting Baker v. United Mine Workers of Am. Health &

6

Ret. Funds, 929 F.2d 1140, 1144 (6th Cir. 1991)). The Glenn Court cautioned that the deferential nature of this standard does not render judicial review a mere formality, but in fact requires the court to review "the quality and quantity of the medical evidence and the opinions on both sides of the issues." Id. (quoting McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir. 2003)).

Moreover, because MetLife is both the decisionmaker and the potential payor of meritorious claims, it may be appropriate to take into account MetLife's self-interest in applying the arbitrary and capricious standard of review. Id.[2] However, in this case the adequacy of MetLife's decisionmaking is ascertainable without regard to any conflict of interest stemming from its dual roles, as explained below.

It is plain from a review of the record that the administration of plaintiff's claims was inefficient at best. MetLife is alleged to have inadvertantly destroyed a letter claim faxed by plaintiff (see Docket Entry No. 105 at 4 & Exh. B, C), and the record reflects that plaintiff did not receive timely notice of the initial denial of his STD claim (AR 8-10); nor of

---

[2]The Glenn Court found that the district court below had not appropriately considered this factor when, after identifying the conflict, the district court then failed to discuss it when analyzing MetLife's decision to terminate benefits. 461 F.3d at 666. However, on January 18, 2008, the U.S. Supreme Court granted certiorari in the case to resolve the issues of whether a conflict of interest is in fact created in this situation, and if so, what role such a conflict should play on judicial review of a discretionary benefit determination. MetLife v. Glenn, --- S.Ct. ----, 2008 WL 161473, 75 USLW 3368, 76 USLW 3017 (U.S. Jan. 18, 2008).

7

the denial of his administrative appeal, a copy of which was misdirected to plaintiff's prior mailing address (compare AR 10 with AR 21); nor of certain documentation upon which the denial of his appeal was based, in particular the report of independent physician consultant Dr. Greenhood. In addition, MetLife failed to make a timely response to several attempts by plaintiff to ascertain the status of his claims. Defendants argue generally that there is no substantive remedy for the various procedural violations which plaintiff alleges. Regardless, MetLife's administration of plaintiff's claim and appeal is troubling, particularly when compared to the regulations which govern such administration.

### B. *Regulatory and Procedural Requirements*

The following provisions apply to claims procedures under plans which provide for disability benefits, explicitly stating, *inter alia*, that such procedures "will not, with respect to claims for such benefits, be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures":

> (h)(2)(iii) Provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. . . .
> (h)(3)(iii) Provide that, in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, . . . the appropriate named fiduciary shall consult with a health care professional who has appropriate training and

>             experience in the field of medicine involved in the
>             medical judgment;
>                     (iv)  Provide for the identification of
>             medical or vocational experts whose advice was obtained
>             on behalf of the plan in connection with a claimant's
>             adverse benefit determination, without regard to
>             whether the advice was relied upon in making the
>             benefit determination;
>                     (v)  Provide that the health care professional
>             engaged for purposes of a consultation under paragraph
>             (h)(3)(iii) of this section shall be an individual who
>             is neither an individual who was consulted in
>             connection with the adverse benefit determination that
>             is the subject of the appeal, nor the subordinate of
>             any such individual; . . .

29 C.F.R. § 2560.503-1(h)(2)-(h)(4).

The record does not reveal that MetLife, at any point during the administrative process, disclosed to plaintiff Dr. Greenhood's identity as a consulting medical expert or the content of his narrative report, despite MetLife's apparent reliance on that report (AR 15) versus the restrictions imposed by plaintiff's treating sources, and despite plaintiff's repeated requests for same. MetLife apparently even failed to produce this information after issuing its decision on his appeal, when it purported to mail plaintiff "copies of the information which was used to make a decision on your claim." (AR 24; Docket Entry No. 100 at 7) Rather, plaintiff claims that he did not receive these materials until the administrative record was produced in this litigation, and defendants are apparently content with the fact that "[i]n this proceeding, he has had full benefit of MetLife's final determination, Dr. Greenhood's report, and

9

MetLife's Diary Review." (Docket Entry No. 98 at 10) Moreover, Dr. Greenhood is board certified in internal medicine and infectious diseases (AR 263), without any apparent training or experience related to diseases or disorders of the eye. In addition, the "Diary Review – Report" contained in the record reveals that Dr. Greenhood was consulted in connection with the initial determination of plaintiff's disability claim (AR 6) as well as the determination on appeal. Contrary to defendants' argument, the undersigned finds that these violations by MetLife of the claims procedures prescribed by ERISA and its interpretive regulations must in fact be corrected in further administrative proceedings, as further justified below.

In particular, defendants' arguments gain no traction when they characterize plaintiff's complaint regarding his LTD claim as a procedural objection for which no substantive remedy is available, as illustrated by the following passage from their response brief:

> Schmittou first complains that MetLife's denial letter is drawn to short-term, rather than long-term, disability benefits. (Pl.'s mem. at 6, 16.) As Schmittou seems to recognize, this result is traceable to Schmittou's checking multiple (and inconsistent) boxes on his tardily-submitted claim form. (*Id*. at 5; *see* AR 210.) Schmittou's assertion that he was "instructed" to do so, or that he received "assurances" in this regard (pl.'s mem. at 5), is unsupported by the record. But even if Schmittou had timely submitted an effective claim for long-term disability benefits, that claim would fail on the same grounds as his short-term claim. Both the short-term and long-term disability Plans require that a claimant be unable to work. (SPD

10

> 9, 44.)  Even the physicians who treated Schmittou at
> the time he was a participant in the Plans will not
> opine that he was unable to do so.  (*See* AR 209 (Dr.
> Jessup's indication that Schmittou had been advised to
> return to work).)  Consequently, any further
> proceedings respecting long-term disability benefits
> would amount to a useless formality.  *See McCartha v.
> National City Corp.*, 419 F.3d 437, 447 (6th Cir. 2005).
> Indeed, Schmittou appears to want no further
> proceedings.  (*See* Pl.'s mem. at 22.)  Because the
> evidence that Schmittou submitted to the claims
> administrator shows that he can work, and he has
> presented no additional information in this litigation,
> any claim of procedural irregularity on this count
> should be turned aside.

(Docket Entry No. 104 at 4-5)

These arguments suffer from a number of defects.  To begin with, the record is utterly devoid of any glimmer of recognition by MetLife of plaintiff's attempt to assert an LTD claim, despite plaintiff's repeated attempts to ascertain the status of that claim (e.g., AR 10, 11, 25, 28, 33, 81) and his administrative appeal from what he characterized as MetLife's constructive denial of that claim "by refusal to acknowledge that Long term claims have been filed" (AR 87).  All of MetLife's correspondence and other documentation, including their decision on plaintiff's appeal, references plaintiff's "Short Term Disability Claims," apparently jointly designated as "Claim # 240205016794" (e.g., AR 24, 31).  The MetLife claim form (AR 210) offers three boxes for the employee to designate the type of disability claim he is filing, presumably by making a mark in only one of the boxes.  The types of claims available are

11

"STD/Salary Continuance," "LTD," or "Unified Disability STD/LTD." Whether pursuant to instructions from a MetLife representative or otherwise, plaintiff checked all three boxes to indicate his desire to file both STD and LTD claims.[3] The undersigned does not agree with defendants that these marks are necessarily inconsistent, but even if they are, it was unreasonable for MetLife to resolve any such inconsistency by ignoring the two indications of plaintiff's desire to file a claim for LTD, and construing the claim form to represent a filing for STD only.

Moreover, defendants' claim that "[b]oth the short-term and long-term disability Plans require that a claimant be unable to work" is patently erroneous. Even the STD plan contemplates "Partial Disability," which may be proved even when the applicant is working full-time[4]; only "Full Disability" under the STD plan requires an inability to perform any of the material duties of the applicant's regular job. (SPD 44) The LTD plan defines "disability" by using a "loss of earnings" test, whereby an otherwise qualified applicant will be found disabled if he is "unable to earn more than 80% of [his] Predisability Earnings or Indexed Predisability Earnings at [his] Own Occupation for any

---

[3] Before he was able to acquire the MetLife claim form, plaintiff evidently attempted to file an STD claim only, by letter purportedly transmitted by facsimile on July 23, 2001 (Docket Entry No. 105, Exh. B & C). However, this attempt to claim STD benefits was evidently unsuccessful.

[4] It does not appear that plaintiff has ever alleged entitlement to Partial Disability under the STD plan. (See Docket Entry No. 1, ¶ 6)

12

employer in [his] Local Economy."[5] (SPD 9) Indeed, the section of the LTD plan which immediately follows its "Definition of Disability" is entitled "Work Incentive," and provides that "[w]hile you are Disabled, you are encouraged to work . . . during your Elimination Period or while Monthly Benefits are being paid to you." (SPD 10) Thus, there is no merit to defendants' argument that because plaintiff's physicians have not opined that he is precluded from all work, any further proceedings on his LTD claim would amount to a useless formality.

## C. Timeliness

In support of their own motion for judgment, defendants argue initially that plaintiff's filings under both the STD and LTD plans were untimely. Though plaintiff's STD claims may have been filed untimely (see SPD 47 (requiring written notice of claim within 20 days after the start of Full Disability); but see Docket Entry No. 105, Exh. B & C (letter claim purportedly faxed to MetLife on July 23, 2001)), MetLife did not invoke the timeliness provisions of the plan despite the advice of the case manager (AR 5), but proceeded to fully consider and decide the merits of the STD claim. Therefore, any claim at this juncture

---

[5]This definition of "disability" obtains during the 90-day "elimination period" which "begins on the day you become Disabled" (SPD 9), and the 24-month period that follows. After this 24-month period, disability must be shown by proof of an inability to earn more than 80% of Indexed Predisability Earnings "from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings." (SPD 9)

13

that plaintiff's STD filing was untimely must be deemed waived. Cf. Horton v. Potter, 369 F.3d 906, 911 (6th Cir. 2004)(noting that waiver by governmental agency of timeliness defense occurs when untimely claim is not merely investigated, but is decided on the merits)(citing, e.g., Ester v. Principi, 250 F.3d 1068, 1071-72 (7th Cir. 2001)).

As to timeliness under the LTD plan, that plan calls for notice of the alleged disability "as soon as you are able," and proof of the disability within three months after a 90-day elimination period (SPD 21). However, with regard to proof of disability, the plan goes on to state that "[n]o benefits are payable for claims submitted more than one year after the date of Disability," unless it is not reasonably possible to give written proof of disability within one year. (Id.) Plaintiff's first claim form was submitted on April 27, 2002 (AR 210). While he was first diagnosed with a choroidal lesion on March 14, 2001, it was not until "April, May, and June 2001" that he alleged significant worsening of his resulting symptoms, including the development of double vision, loss and reversal of words and letters, and limited reading comprehension (AR 90). Though plaintiff may have listed March 14, 2001 as the date of his injury in his workers' compensation filing, it is clear that he worked full-time while dealing with his symptoms through June 2001, and he apparently only mentioned his increasing

14

difficulties and the possibility of disability or workers' compensation to his supervisor in late June and early July, 2001 (AR 98-102, 103).  In any event, MetLife at all points in the administrative record regarded plaintiff's alleged disability as commencing July 7, 2001, the day after his date last worked (e.g., AR 32), and the first day upon which his loss of earnings may begin to be ascertained.  Accordingly, in view of the plan provisions and MetLife's own conduct (or lack thereof), the undersigned finds no merit in the argument that this claim should be barred because it was filed "more than one year after the date of Disability."

### D.  The Merits

As to MetLife's decision on the merits of plaintiff's STD claim (AR 31-32), it appears that the decision to deny benefits based on the fact that plaintiff did not meet the "actively at work" requirement was rational in light of the plan's provisions.  As recited in MetLife's decision, the STD plan defines "Actively at Work" to "mean[] that you are performing all of the material duties of your job with the Employer where these duties are normally carried out.  If you were Actively at Work on your last scheduled working day, you will be deemed Actively at Work:  1. on a scheduled non-working day; 2. provided you are not disabled." (SPD 41)  The plan goes on to provide that "[a]ll of your benefits will end on the last

15

day of the calendar month in which your employment ends. Your employment ends when you cease Active Work as an Employee." (SPD 48) It thus appears that even if plaintiff were otherwise entitled to STD benefits, that entitlement would have ended no later than July 31, 2001, the last day of the calendar month following his termination from employment on July 6, 2001. The STD plan is drawn to provide benefits to current employees who have their "active work" interrupted by a period of disability, and MetLife rationally concluded that plaintiff was not fully disabled while continuing to report for work prior to his termination; thereafter, he was not "actively at work" and could not establish his entitlement to STD benefits going forward. While plaintiff argues that his termination for performance proves his inability to perform satisfactorily the material duties of his job, this contention is more persuasive in the context of his LTD claim, as plaintiff seems to recognize by gearing the majority of his arguments toward his entitlement to LTD benefits.

However, but for the application of the "Actively at Work" provision, the undersigned would recommend finding the two-page denial decision arbitrary and capricious, inasmuch as it is nearly devoid of any meaningful analysis of the medical evidence, and thus fails to reflect any "deliberate, principled reasoning process . . ." Glenn, 461 F.3d at 666. Rather, the decision on

16

the merits of the medical evidence merely gives a brief recital of plaintiff's relevant medical history before arriving at the following conclusion:

> . . . Prior to [transpupillary-therma-] therapy, you had essentially normal right-sided visual acuity.
>
> While your job required the ability to read documents, there is no clinical evidence that is conclusive enough to support disability nor does it show an acuity or severity of symptoms which would preclude you [from] work.
>
> You last date worked was July 6, 2001. Upon review of the clinical evidence it does not support disability beginning July 7, 2001. While there is evidence that you had difficulties July 7, 2001 we do not have information to support disability from July 7 through December [2002], when your visual acuity was 4/200. Therefore you did not meet the actively at work provision nor is there sufficient medical evidence to support full and or partial disability from July 7, 2001 to December, 2002.

(AR 32) Other than evidencing MetLife's misapprehension of visual acuity as a measure of overall ocular function,[6] this decision provides no insight into the decision-making process. The Sixth Circuit very recently dealt with a similar denial letter, as follows:

> We finally register our serious concern that the final denial letter fails to explain the reasons for its decision. The three-page letter uses approximately one page to explain the standard for own-occupation disability. The next page simply lists the approximately ninety documents which were included in the review of Bennett's claim. The actual explanation of the decision-making process employed simply states that Broadspire did not believe that the submitted

---

[6] See, e.g., Docket Entry No. 1 at 67.

17

>     documents contained "sufficient medical evidence . . .
>     to substantiate a significant functional impairment
>     that would prevent [] [] Bennett from performing the
>     essential functions of any occupation."  J.A. at 313
>     (Final Decision).  This reads like a conclusion, not a
>     "deliberate, principled reasoning process . . .
>     supported by substantial evidence."  *Glenn*, 461 F.3d at
>     666.  Accordingly, we hold that Broadspire's
>     determination cannot withstand scrutiny under the
>     "arbitrary or capricious" standard of review.

<u>Bennett v. Kemper Nat'l Servs., Inc.</u>, --- F.3d ----, 2008 WL 183225, at *7 (6th Cir. Jan. 23, 2008).

### *E. Conclusion*

In sum, the undersigned finds that MetLife's total disregard for plaintiff's LTD claim, despite his repeated efforts to call their attention to said claim, was arbitrary and capricious.  Though the tenor of some of plaintiff's correspondence with MetLife likely did not help his cause, MetLife committed several procedural violations which, in view of the other failures cited above, must be corrected in further proceedings on his claim for LTD benefits.  Whether plaintiff wants to proceed further before MetLife or not, the Court cannot properly decide his LTD claim in the first instance.  <u>See</u> <u>Glenn</u>, 461 F.3d at 672 ("[T]he court's role is to review the basis for the decision that was actually made by the plan administrator, not to provide an adequate basis where none was offered."). Accordingly, further proceedings by the administrator must be had with respect to that claim.

18

IV.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that defendants' motion for judgment on the administrative record be **GRANTED in part** and **DENIED in part**; that plaintiff's motion for judgment on the administrative record be **GRANTED in part** and **DENIED in part**; that MetLife's decision to deny short-term disability benefits under the "Actively at Work" provision of that plan be **AFFIRMED**; and, that MetLife be **DIRECTED** to consider the merits of plaintiff's claim for long-term disability benefits.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

19

**ENTERED** this 30th day of January, 2008.

                                                     s/ John S. Bryant
                                                   JOHN S. BRYANT
                                                   UNITED STATES MAGISTRATE JUDGE