IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

BARRY SCHMITTOU            )
                           )
v.                         )        No. 3:05-0013
                           )        Judge Trauger/Bryant
METROPOLITAN LIFE INS. CO., ET AL.    )


To:    The Honorable Aleta A. Trauger, District Judge


## REPORT AND RECOMMENDATION

### I. INTRODUCTION

This civil action is brought pursuant to section 502(e) of the Employee

Retirement Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA").  Plaintiff, proceeding

pro se and in forma pauperis, filed his complaint on January 6, 2005.  (Docket Entry No. 1)

On December 9, 2005, defendants Metropolitan Life Insurance Company ("MetLife") and

TMG Solutions, Inc. ("TMG") filed under seal a copy of the administrative record.  (Docket

Entry No. 45)  On October 5, 2006, the case was reassigned to the undersigned Magistrate

Judge for further proceedings on nondispositive matters.  (Docket Entry No. 74)

On January 25, 2007, the undersigned authorized limited discovery requested

by plaintiff (Docket Entry No. 80), and competing motions for judgment on the

administrative record were subsequently filed.  On March 24, 2008, the Court remanded this

matter to MetLife, to conduct a full and fair review of plaintiff's claim to long-term disability

("LTD") benefits.  (Docket Entry No. 113)  That review resulted in a May 5, 2010 decision by

MetLife to grant LTD benefits for a two-year period (October 5, 2001 through October 4,

2003) based on plaintiff's mental disability, but otherwise to deny LTD benefits. After exhausting his administrative appeals, plaintiff received a final decision from MetLife, dated June 16, 2011, in which MetLife upheld its decision to deny LTD benefits beyond October 4, 2003. (Docket Entry No. 170-3 at 9-14 (AR 274-79))

By Order entered March 19, 2012 (Docket Entry No. 165), the undersigned directed the filing of the supplemented record of administrative proceedings, which was duly filed by MetLife on April 5, 2012 (Docket Entry No. 170). A deadline for filing the parties' cross-motions for judgment on the administrative record was thereafter set. (Docket Entry No. 192) Those motions on the supplemented administrative record were filed by MetLife (Docket Entry No. 195) and by plaintiff (Docket Entry No. 198), with responses also filed by both parties. These motions for judgment are currently pending, and are the subject of this Report and Recommendation. For the reasons given below, the undersigned recommends that MetLife's motion for judgment on the administrative record be GRANTED in part and DENIED in part, that plaintiff's motion for summary judgment on the administrative record and second request for special prosecutor be GRANTED in part and DENIED in part, and that this case be REMANDED to MetLife for further consideration of plaintiff's mental impairments, including, if necessary, a formal psychiatric evaluation at MetLife's expense pursuant to the provision for same in the LTD plan.

II. BACKGROUND

In the undersigned's prior Report and Recommendation, which was adopted by the Court in ordering the 2008 remand to MetLife, the evidence and administrative proceedings of record to that point were summarized as follows:

2

Plaintiff worked for TMG as a National Field Manager until July 6, 2001, when his employment was terminated for reasons related to his job performance (AR 4, 253). In January 2001, plaintiff had begun to experience irregular visual symptoms in his right eye (AR 90). In February 2001, plaintiff had received a commendable performance evaluation and a raise. Id. From mid-March to early July, 2001, plaintiff complained of progressively worsening visual symptoms, first to his health care providers and then to his managers at TMG. Id. On July 2, 2001, plaintiff sent an e-mail to his managers detailing his symptoms and medical treatment, and requesting two days of unpaid medical leave (AR 99-102). On July 3, 2001, plaintiff sent an e-mail to his manager informing her of his upcoming doctor visits, in which he also mentioned "a formula that is used to determine abilities and disabilities" and asked whether he should file a claim for workers' compensation (AR 103). On July 6, 2001, plaintiff was fired. It was not until April 27, 2002, that plaintiff filed a form with MetLife reflecting his claims for STD and LTD benefits, based on complaints of "sharp eye pain, image jumps, double vision, [and] loss and reversal of words & letters." (AR 210) MetLife is the insuror of STD and LTD plans that had issued to TMG for the benefit of its employees, and claims under those plans are likewise administered by MetLife (SPD 30, 50).

The medical and other evidence of record is summarized in defendants' memorandum (Docket Entry No. 98 at 3-6) as follows:

> In connection with his claim, Schmittou submitted an attending physician statement by Dr. Jeffrey C. Jessup, an optometrist. (AR 208-09) Dr. Jessup diagnosed Schmittou with diplopia (double vision) and convergence insufficiency. (AR 208) Dr. Jessup left the "physical capabilities" section of the form blank, stated that he had advised Schmittou to return to work, but that he should limit reading or nearwork to three hours per day. (AR 209)
> In an accompanying letter apparently prepared in connection with a workers' compensation claim, Dr. Jessup explained Schmittou's medical

3

history in some detail.  (AR 211-13)  Dr. Jessup noted that Schmittou had been diagnosed with a pigmented choroidal lesion (a small growth in the retina) in his right eye in March 2001.  (AR 211)  Schmittou's visual acuity was 20/20 in that eye, but with a subjective "blur."  (*Id.*)  On July 9, 2001, after Schmittou's termination, Dr. Jessup noted that Schmittou's right eye unaided visual acuity was 20/25, and he advised Schmittou to limit close work and reading.  (AR 211-12)

In September 2001, examination revealed that the right retinal lesion "was essentially unchanged," and a recommendation of continued follow-up was made.  (AR 212)  In October and November, Dr. Jessup conducted a battery of tests to determine whether Schmittou's subjective complaints were caused by the lesion or by complications of poor binocular visual skills.  (*Id.*)  Visual fields testing revealed a slightly enlarged blind spot in the right eye, but no other abnormality.  (*Id.*)  Binocular vision tests revealed low fusional reserves (a measurement of how much stress the convergence and divergence mechanisms of the eyes are able to cope with when placed under stress), a treatable condition.  (*Id.*)

Writing in February 2002, Dr. Jessup concluded, "In summary, this patient has a cho[r]oidal nevus of suspicious nature in the right eye which is being monitored."  (*Id.*)  In Dr. Jessup's view, Schmittou's subjective complaints "are nearly always remediable by specific lenses, exercises, and programmed activities," for which Schmittou had been referred to an orthoptist [, "along with appropriate adjustment of required visual demands in terms of size, working distance, lighting, and length of time required undergoing the activities in question."]  (AR 213)

Schmittou additionally submitted the results of a workers' compensation claim, which had been denied.  (AR 214)  The State observed that, in March 2001, Schmittou's doctors did not take him off work or place him under work restrictions; in fact, they simply recommended documenting the lesion and following him closely for signs of change.  (AR 216)  The State further noted that there was no credible medical evidence to support Schmittou's claim that he had suffered a mental injury.  (AR 217)

On May 2, 2002, Schmittou submitted a new claim statement, now complaining of mental illness.  (AR 241)  In support of this claim, Schmittou presented an attending physician statement by Susan B. Carpenter, a psychologist.  (AR 239-40)  Dr. Carpenter remarked that Schmittou was unable to deal with time pressure, quotas, or interpersonal conflict, and "would require unusually supportive supervisor at this time."  (AR 240)  Dr. Carpenter noted, however, that she had not advised Schmittou to cease work

at TMG because she had not begun seeing him until four months after his termination.  (AR 239)  In an accompanying letter, Dr. Carpenter stated:

> If Mr. Schmittou had been employed at the time of our initial session, I can imagine I would have recommended a brief mental leave of absence.  He was agitated, had limited impulse control, was distrustful of management with passive thoughts of revenge.  If the symptom picture was the same in July 2001, as reported by Mr. Schmittou, and if he had consulted a mental health professional at that time, I suspect that professional would have recommended a leave of absence.

(AR 250)

MetLife determined to deny the claim, and Schmittou appealed.  (AR 7,8; Docket Entry No. 63, Exh. A; AR 87-104)  In addition to a lengthy narrative setting forth his complaints, Schmittou submitted office notes from Dr. Jessup and letters from Drs. Everton L. Arrindell and R. Trent Wallace, retinal specialists to whom Dr. Jessup had referred Schmittou.  (AR 106-07, 111, 115-25)  Dr. Jessup's records note Schmittou's subjective complaints, and contain the testing results described in his letter of February 1, 2002.  (AR 107-11, 115-22, 124-25)  Dr. Wallace's letter of December 23, 2002 – written some eighteen months after Schmittou's termination from TMG – indicates that Schmittou had undergone transpupillar thermal laser therapy to remove the choroidal lesion in the latter part of the year.  (AR 111)  "Prior to treatment," Dr. Wallace wrote, "I explained to Mr. Schmittou that there would probably be a considerable decrease in his vision with the laser therapy and he was understanding of this."  (*Id.*)  As a result of the 2002 treatment, Schmittou's vision dropped to 4/200 in the right eye.  (*Id.*)

MetLife referred these materials for review by independent physician consultant Dr. Gary P. Greenhood, who is board-certified in internal medicine.  (AR 14-15, 262-63)  Dr. Greenhood opined that, while Schmittou's right-sided visual acuity and visual field were relatively normal in 2001, it was certainly probable that the retinal lesion caused blurred vision.  (AR 262)  Dr. Greenhood concluded, however, that Schmittou had only a mildly abnormal right-sided visual field prior to the transpupillary therma-therapy, which would not be expected to limit reading and near-vision to 3-4 hours per day.  (AR 263).

(Docket Entry No. 106 at 2-6)

Following this Court's affirmance of MetLife's denial of short-term disability benefits and remand of the matter to MetLife for consideration of plaintiff's claim to LTD benefits, further evidence was marshaled by MetLife and considered against the LTD benefits plan definition of "disability," which applies to an employee who, "due to sickness, pregnancy or accidental injury, [is] receiving Appropriate Care and Treatment from a Doctor on a continuing basis," and to whom one of the following two conditions pertains:

> (1) during [the employee's] Elimination Period and next twenty-four month period, the employee is unable to earn more than 80% of his pre-disability earnings or indexed pre-disability earnings at his Own Occupation for any employer in his local economy; or
>
> (2) after the twenty-four month period, the employee is unable to earn more than 80% of his indexed pre-disability earnings from any employer in his local economy at any gainful occupation for which he is reasonably qualified taking into account his training, education, experience and pre-disability earnings.

(Docket Entry No. 45-1 at 9 (SPD 0009))

In the event that a plan participant is found disabled due to a mental or nervous disorder, the plan limits payment of monthly benefits to a period of 24 months during the participant's lifetime, unless the disability results from "(a) schizophrenia; (b) bipolar disorder; (c) dementia; or (d) organic brain disease." Id. at 17 (SPD 0017).

Moreover, in the event that a participant is awarded disability benefits from other sources such as, inter alia, the Social Security Administration, the LTD plan calls for an offset in the amount of such an award against any benefits payable by the LTD plan. Id. at 12-13 (SPD 12-13). On March 20, 2007, the Social Security Administration, upon the decision of Administrative Law Judge Ronald E. Miller, found plaintiff to be disabled and

awarded him monthly benefits based on the combined effects of his cancer of the right eye, decreased visual acuity of the left eye, and mood disorder. (Docket Entry No. 170-9 at 24-27 (AR 1585-1588))

The evidence and other correspondence produced during post-remand administrative proceedings is well summarized in MetLife's memorandum (Docket Entry No. 197 at 6-30), and is discussed in detail as pertinent to the undersigned's legal analysis, below.

## III.  Conclusions of Law

In light of the provision to MetLife of "discretionary authority to interpret the terms of the Plan[s] and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan[s]" (SPD 31, 53), this Court reviews MetLife's determinations under the arbitrary and capricious standard. E.g., McCartha v. National City Corp., 419 F.3d 437, 441 (6th Cir. 2005). Under this standard of review, MetLife's decision to deny plaintiff's claims will pass muster if that decision is rational in light of the plans' provisions. Id. (quoting Marks v. Newcourt Credit Group, Inc., 342 F.3d 444, 456-57 (6th Cir. 2003)). The Sixth Circuit has elsewhere described the arbitrary and capricious standard of review as requiring that the decision be upheld "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Glenn v. MetLife, 461 F.3d 660, 666 (6th Cir. 2006) (quoting Baker v. United Mine Workers of Am. Health & Ret. Funds, 929 F.2d 1140, 1144 (6th Cir. 1991)). The Glenn court cautioned that the deferential nature of this standard does not render judicial review a mere formality, but in fact requires the court to review "the quality and quantity of the medical evidence and the opinions on both sides of the issues." Id. (quoting McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161,

172 (6th Cir. 2003)).

Moreover, because MetLife is both the decisionmaker and the potential payor of meritorious claims, it is appropriate to take into account MetLife's self-interest in applying the arbitrary and capricious standard of review. While this factor must be considered whenever present, the conflict is given more weighty consideration "where circumstances suggest a higher likelihood that it affected the benefits decision...." MetLife Ins. Co. v. Glenn, 554 U.S. 105, 117 (2008).

Both in his response to defendants' motion for judgment on the administrative record and in his own such motion (Docket Entry Nos. 198, 211), as well as in his "Urgent Objection to Lies in Errata filed by MetLife" (Docket Entry No. 213), plaintiff engages in a lengthy, vituperative narration of MetLife's alleged disregard for federal law and the wellbeing of its policyholders and their beneficiaries, with his legal arguments as to the unsustainability of MetLife's decision in his particular case interspersed at points within the narrative. However, the essence of plaintiff's case is his contention that MetLife's June 16, 2011 decision -- in which it upheld the earlier decision to terminate his LTD benefits after expiration of the 24-month period ending October 4, 2003 -- arbitrarily and capriciously adopted the conclusions of its physician consultants Dr. Lawrence Osborn and Dr. Joseph Goetz, in the face of contrary conclusions from, respectively, his treating psychologist Dr. Susan Carpenter and his eye surgeon Dr. Trent Wallace,[1] as well as in the face of contrary

---

[1]To be fair, plaintiff's motion papers are almost exclusively devoted to arguments regarding his physical impairments, in particular his visual symptoms. Nonetheless, at page 58 of his 80-page memorandum in support of his motion for judgment (Docket Entry No. 198), plaintiff claims that "When I read about bipolar symptoms and discussed this with my Psychologist she diagnosed me as bipolar in her written report in 2011 but then MetLife refused to pay benefits for bipolar. I believe this is arbitrary and capricious." Plaintiff goes on to state that he wants this psychological claim "to

evidence in the form of the litany of correspondence in which plaintiff and others who have known him describe his symptoms and limitations.

The Mental Claim

As referenced above, following this court's remand in 2008, plaintiff was found to be disabled under the LTD plan due to his mental impairments. (Docket Entry No. 170-6 at 38-44 (AR 1000-1006)) This determination was supported by the assessment of a psychiatric consultant who reviewed plaintiff's file, Dr. Peter Sugerman. Dr. Sugerman largely deferred to Dr. Carpenter's opinion of plaintiff's functional impairment after speaking with her on the telephone, in which conversation she confirmed that plaintiff had never been diagnosed with bipolar disorder, and that when he was agitated he demonstrated "more of an obsessional style of thinking" (versus, presumably, a manic style). (Docket Entry No. 170-7 at 4 (AR 1266)) By letter dated May 5, 2010, MetLife informed plaintiff as follows:

> The provisions of the Plan allow up to 24 months for your lifetime for disabilities due to mental or nervous disorder or diseases. We have determined that your diagnoses of major depression, anxiety disorder, mania, stress and dysphoria fell under this provision. Based on the information on file, your long term disability benefits will be allowed from October 5, 2001 through October 4, 2003 at which time you will have received the maximum 24 months allowed for these diagnoses. You would not be eligible for any long term disability benefits for these diagnoses beyond October 4, 2003, especially because your diagnosis of bipolar disorder was not supported by clinical evidence.

---

be a factor in determining that MetLife and their consultants were arbitrary and capricious regarding their evaluation of my LTD claim for disability due to eye problems. If and only if the Court rules they are arbitrary and capricious regarding the LTD eye claim and orders benefits to be paid for the time I requested for the visual claim then I request that the Court will also determine if my other assertions . . . regarding bipolar and psychological should also result in a ruling that benefits should be paid." Id. at 58.

Id. at 42 (AR 1004).  Plaintiff appealed this partial award administratively, and in so doing

requested that Dr. Carpenter write a letter on his behalf.  In that letter dated November 30,

2010, Dr. Carpenter summarized her treatment of plaintiff, which began in 2001, lapsed

between 2002 and 2008 due to insurance difficulties, and picked back up in 2008, continuing

to the present.  In her letter of November 30, 2010, Dr. Carpenter opined that her

"impression was and remains that the . . . stresses [associated with his eye cancer, surgery,

subsequent loss of employment, and MetLife's inattention to his disability claims]

precipitated his depression and anxiety, and may have triggered some bipolar instability."

(Docket Entry No. 170-4 at 207 (AR 672))  Dr. Carpenter's letter was forwarded to Dr.

Osborn for his consideration.

Dr. Osborn originally reported on March 29, 2011, that while plaintiff's

impairments and resulting limitations endured after October 4, 2003, "[i]t is . . . clear that his

psychiatric impairments were due to Major Depression and PTSD and not to any diagnosis of

Bipolar Illness, or to Schizophrenia, Organic Brain Disease or Dementia from any etiology."

(Docket Entry No. 170-3 at 25 (AR 290))  Dr. Osborn further opined that

> ...one might wonder if a comprehensive psychiatric evaluation, one that never
> occurred, might have resulted in some consideration of a possible personality
> disorder.  It is also remotely possible that such a comprehensive psychiatric
> evaluation might have also introduced the possibility of some bipolar variant
> as a diagnostic consideration, but it is evident that the clinical data available to
> date would not, even in retrospect, support any finding that criteria for a
> bipolar disorder would have conceivably been met prior to October of 2003.

Id. at 25-26 (AR 290-91).  On May 31, 2011, having been forwarded Dr. Osborn's opinion by

MetLife, Dr. Carpenter responded with another letter in which she cited her earlier

observance of "bipolar instability" in plaintiff, and asserted her newfound belief that --

particularly in light of new information which plaintiff had only recently revealed that

demonstrated his impulsive, ill-conceived, and hypomanic behaviors between 2002 and

2008,[2] as well as his "hyper goal-directed" behavior in pressing his disability claims -- she

had misdiagnosed or under-diagnosed plaintiff, and that in fact he "was confronted with a

series of major stresses which either triggered the development of a bipolar disorder or

destabilized an already existing bipolar disorder." Id. at 35-38 (AR 300-303).

       This May 2011 letter from Dr. Carpenter was forwarded by MetLife to Dr.

Osborn, to see if it changed his opinion that plaintiff's disability was not due to bipolar

disorder. In an addendum to his original report, Dr. Osborn noted his very high regard for

---

[2]In her November 2010 letter, written just six months prior to her letter describing her discovery of this new information, Dr. Carpenter had related that "[n]ow, in addition to his impaired vision, he has intense psychological distress, impaired concentration, impaired frustration tolerance, fitful sleep, irritability, and hypervigilance, all hallmarks of Post-traumatic Stress Disorder." (Docket Entry No. 170-4 at 207 (AR 672)) Her letter of May 31, 2011 cites behavior which she believes to illustrate the opposite emotional extreme: grandiose plans to parlay thousands of dollars worth of impulsive purchases of merchandise that he had made into his own profit on resale, or to give such merchandise away; plus,

> In addition to impulsive spending, I have learned Mr. Schmittou has experienced other types of behaviors that seem elevated, grandiose, or expansive. For example, in 2002, Mr. Schmittou told me about being involved in some public protests at the Tennessee Capitol building. However, he did not mention at the time that he was the lead story on one local news channel, singing a song he wrote about injustices in government. Or that within weeks he was on another local news channel three consecutive nights, leading a group singing. That information was revealed much later. [] While not in therapy between May 2002 and February 2008, Mr. Schmittou continued to be politically active, at least sporadically. I recently learned that, in that interim, he ran for Mayor of Nashville in 2003, coming in third in a field of six. He stated he ran for mayor in order to have public speaking opportunities to highlight unjust laws and regulations that "just leave injured workers to die." Further, in 2005, he filed a complaint that led to the conviction of Tennessee State Senator John Ford on corruption charges.

(Docket Entry No. 170-3 at 36 (AR 301))

the opinions expressed in Dr. Carpenter's letter, but adhered to his original opinion, as

follows:

> After a careful reading and review of Dr. Carpenter's excellent letter of 5-31-2011, this reviewer certainly agrees that there is some evidence of manic behavior and hyperactivity, and also notes that there is considerable overlap among the signs and symptoms of MDD [(major depressive disorder)], Anxiety Disorders, PTSD [(Post-traumatic Stress Disorder)] and Bipolar Illness, with the Bipolar Illness diagnosis often not made until considerable periods of time have elapsed, but the reviewer's opinion articulated in the Parent Report that a Bipolar Illness diagnosis was not formally made by Dr. Carpenter, or any other provider, despite many opportunities to make that diagnosis and identify the requisite DSM-IV criteria required for a Bipolar Diagnosis, remains unchanged, for the following reasons:

> 1.  The claimant's set of functional limitations, and signs and symptoms of illness, are quite adequately explained on the basis of the Diagnoses that were formally made by Dr. Carpenter and others; namely, MDD with anxiety, and PTSD, with perhaps some Personality Disorder NOS.

> 2.  The claimant, as Dr. Carpenter agrees, might have been somewhat better served had he undergone a comprehensive psychiatric evaluation, to provide second opinions regarding diagnosis and treatment strategies.

> 3.  A Psychiatric evaluation would be strongly recommended at this point, with a question posed about the possible substantiation of a Bipolar Illness diagnosis, and it is possible that such an evaluation would find the clinical basis for a Bipolar diagnosis.

> 4.  It is not clear to this reviewer what impact such an after the fact diagnostic change would have on the MetLife benefit decisions that have been made and may be made going forward.

> 5.  Absent an independent psychiatric evaluation to provide confirming or affirming diagnostic impressions, based on a thorough record review and face to face examination of the

> Claimant, there appears to be still insufficient evidence from the overall picture of clinical information to support a formal diagnosis of Bipolar Illness as the primary psychiatric condition responsible for the Claimant's well documented continuous functional impairments in critical work-related abilities and capacities, in this reviewer's opinion, while acknowledging that an independent psychiatric evaluation might indeed provide such justification, should that take place at some point in the future.

(Docket Entry No. 170-3 at 16-17 (AR 281-282)) After summarizing this addendum report and the original report of Dr. Osborn, MetLife's decisionmaker, Ms. Sharon Adkins, found that "[a]fter a complete review of all information provided, the medical [evidence] did not support any of the exclusionary diagnoses of schizophrenia, bipolar disorder, dementia, or organic brain disease beyond October 4, 2003." Id. at 13 (AR 273).

The undersigned would initially note that Dr. Carpenter's reconsideration of plaintiff's appropriate diagnosis is made in light of newly discovered information, and upon a foundation of previously observed "bipolar instability," rather than being the sort of reversal that could reasonably be construed as nothing more than a post hoc effort to assist her patient in gaining LTD benefits. Cf. Schleicher v. Ascension Health, 2006 WL 686374, at *12 (M.D. Tenn. Mar. 17, 2006) (citing Raskin v. UNUM Provident Corp., 121 Fed. Appx. 96 (6th Cir. 2005) (finding that ERISA plan administrator's denial of participant's claim for LTD benefits was not arbitrary and capricious where plaintiff's treating physicians both initially reported that plaintiff could return to work without any restrictions or limitations and, only after learning that his benefits were being discontinued, did the doctors change their opinions)).

Prior to receiving this updated information and opinion from Dr. Carpenter,

MetLife was fully justified in relying upon the lack of a definitive diagnosis of Bipolar Disorder explaining the few references in the record to associated symptoms, as plaintiff had to that point simply failed to meet his administrative burden of proving the existence of a condition excepted from the 24-month limitation on mental health related disability.  See Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 381-82 (6th Cir. 1996).  However, upon receipt of Dr. Carpenter's 2011 letter and Dr. Osborn's broad agreement with it, save for his continued reliance upon the lack of a formal psychiatric diagnosis as justification for denial of benefits past 24 months, MetLife was in position to either refer plaintiff for such a formal psychiatric evaluation as it had the right to do under the plan (Docket Entry No. 45-1 at 22) and as the experts agreed would be in order, or to continue to rely upon Dr. Osborn's determination that Dr. Carpenter's previous failure to affirmatively diagnose Bipolar Disorder could not be overcome on the record as it stands, despite her "very thoughtful, complete, comprehensive and well stated" basis for changing her diagnostic opinion. (Docket Entry No. 170-3 at 16 (AR 281))  MetLife chose the latter course, and in so choosing, acted arbitrarily and capriciously.

	The district court in Patrick v. Hartford Life and Accident Ins. Co., 543 F.Supp.2d 770 (W.D. Mich. 2008), faced a similarly disposed administrative record and denial of benefits.  The administrator in Patrick did not contest the diagnosis of fibromyalgia, and initially awarded benefits based upon a treating doctor's assessment that the combination of the plaintiff's symptoms of fibromyalgia and unipolar depression left her with limitations that would preclude the performance of her prior job, or any job that was not sedentary. However, after 24 months, the disability standard required proof of inability to perform any job, and the administrator terminated the plaintiff's benefits based on her physician's

14

allowance that she could perform sedentary work.  However, on administrative appeal from this decision to terminate benefits, the plaintiff sent the administrator an updated medical statement from her physician in which the physician opined that the plaintiff's fibromyalgia symptoms "totally and permanently disabled [her] from any and all employment at this time." Id. at 777.  Though the administrator had relied upon the physician's previous opinion in initially awarding benefits, it rejected the physician's evolving opinion of the plaintiff's condition and continued to rely upon the same physician's earlier assessment that sedentary work would be possible, based on a file review consultant's opinion that the more restrictive opinion was not objectively supported in the record.  The court found that this continued reliance on the physician's earlier opinion while noting at the same time that the physician's most recent opinion appears to contradict his earlier one amounts to selective, rather than objective, review of the medical record.  Id. at 778.

> In addition, Hartford's file review of Patrick's claim was not objective. Although the file review is only one factor to consider under the arbitrary and capricious standard of review, *Calvert*, 409 F.3d at 295, the Court notes that Hartford discredited Dr. Weber's conclusions based solely on a lack of objective evidence (for which it never asked) when it had the option to examine Patrick and obtain its own functional capacity evaluation.  If Hartford believed that Patrick was able to work despite her fibromyalgia and reports of debilitating pain, it could have ordered its own examination instead of relying on one statement in a previous PCE by the very same doctor whose current opinion it was discrediting.  By not asking Dr. Weber to supply an updated PCE and not ordering its own examination, Hartford acted arbitrarily and capriciously in denying Patrick's claim based on a file reviewer's conclusion that there was insufficient medical evidence supporting Patrick's inability to work.

Id. at 778-79.

This conclusion obtains even more so upon the facts of the case at bar, where

MetLife failed to discuss in its final decision on appeal the particulars of Dr. Carpenter's updated opinion letter, or Dr. Osborn's endorsement of an independent psychiatric evaluation of plaintiff to clarify the diagnosis of plaintiff's symptoms of bipolar disorder versus unipolar depression and other co-morbid disorders. Instead, MetLife elected to stand upon the qualified assessment of Dr. Osborn that the record of mental health related evidence (comprised mainly of Dr. Carpenter's earlier notes and her prior opinion letter) as it currently stands does not contain sufficient evidence of formally diagnosed/diagnosable Bipolar Disorder, without ordering its own examination as even its own consultants suggested.[3] This decision does not reflect the deliberate, principled reasoning process necessary to sustain MetLife's decision. The undersigned thus concludes that MetLife's decision with regard to the limitation to 24 months of plaintiff's mental health related benefits was arbitrary and capricious.

<u>The Physical Claim</u>

Plaintiff devotes substantially all of his argument to contesting the disposition of his claim to LTD benefits based on his visual symptoms and limitations. In reviewing that claim, MetLife employed Dr. Alan Weber, an ophthalmologist, who reviewed plaintiff's file and opined on his visual limitations on February 2, 2010. (Docket Entry No. 170-6 at 259-65 (AR 1221-1227)) Dr. Weber contacted plaintiff's surgeon, Dr. Trent Wallace, by telephone, and recorded that in that interview Dr. Wallace noted his last visit with plaintiff in September 2008, at which time plaintiff's left eye visual acuity was 20/25 but he had, in

---

[3]In addition to Dr. Osborn, the ophthalmologist consultant, Dr. Weber, opined in February 2010 that "it is an imperative that Mr. Schmittou receive[] a very thorough psychiatric, not psychologic, evaluation in the very near future." (Docket Entry No. 170-6 at 264 (AR 1226))

essence, functional loss of vision in the right eye following the 2002 laser surgery to remove the cancerous lesion in that eye. At the time of that 2008 visit, plaintiff complained of pain in the right eye and double vision, but Dr. Wallace had no objective explanation for either symptom. Dr. Weber recorded that "Dr. Wallace acknowledges that the source and mechanism of the patient's symptoms is a 'troubling issue for him.' The conversation with Dr. Wallace was very thorough and we agreed that this was a case of subjective complaints without objective findings." Id. at 260 (AR 1222).

Dr. Weber further reviewed the treatment notes of Dr. Patrick J. Lavin, a Vanderbilt neuroophthalmologist. In treating plaintiff during 2004 and 2005, Dr. Lavin had noted plaintiff's report of disturbances in his left visual field,[4] and observed that when plaintiff became agitated, his left eyelid blinked and his eye jumped. However, he noted no involuntary eye movements such as nystagmus. Dr. Lavin's initial impression related to that observation was "subjective oscillopsia left eye with no objective finding." Dr. Lavin recommended that, "[b]ecause I cannot explain his symptoms and cannot find any objective reason for them other than the eye lid fluttering when he gets tense," an MRI of the head and orbits would be in order. The next month, upon plaintiff's report of objects appearing to move when he focused hard on them (though not when he is relaxed or looking at distant objects in the sky), Dr. Lavin's examination "under the Slit lamp" revealed "a very fine downbeat nystagmus worse in the left eye and worse on lateral gaze;" Dr. Lavin did not

---

[4]Dr. Lavin noted that plaintiff had reported noticing in 1990 that the image in his left eye pulsated after orbital surgery in 1989 to remove a mass above and behind his left eye, and that "[s]ometime after laser therapy [in 2002] . . . he began to experience an irregular pattern of opscillopsia with the left eye - particularly when he focused or concentrated. . . . For the opscillopsia he saw Dr. Bond who gave him atenolol and this caused him to be light headed." (Docket Entry No. 170-8 at 114 (AR 1416))

appreciate this nystagmus on fundoscopic examination. Dr. Lavin stated that the nystagmus might explain plaintiff's symptoms, but that the pattern of his oscillopsia was not typical of downbeat nystagmus. He prescribed Neurontin 100mg, though he could find no obvious underlying cause for the nystagmus. However, plaintiff could not tolerate the Neurontin, and following a subsequent examination in June 2005,[5] when Dr. Lavin could not detect the downbeat nystagmus but did appreciate a few cycles of fine upbeat nystagmus, Dr. Lavin advised plaintiff to seek another opinion on these left eye symptoms. Id. at 262-63 (AR 1224-1225); see also Docket Entry No. 170-8 at 114-120 (AR 1416-1422). Plaintiff apparently declined to do so.

Dr. Weber opined that due to plaintiff's monocular status and resulting loss of depth perception, he would remain capable of driving a car and performing the usual and customary duties of a national field manager, but would be restricted from using heavy equipment, operating power tools, and climbing ladders to heights at which he might be endangered by a fall. Id. at 264.

Dr. Weber's review was sent by MetLife to plaintiff's prior eye doctors Jessup, Head, and Arindell, but not to Dr. Wallace. Id. at 41. Plaintiff himself sought clarification from Dr. Wallace regarding his statement that plaintiff's symptoms were purely subjective, since plaintiff's primary complaint is and has been that his remaining visual field jumps and his left eye pulses with every heartbeat, that these disturbances have caused vertigo and other disturbances of balance resulting in numerous falls and accidents, and that these issues

_____

[5]Plaintiff continued at this visit with Dr. Lavin to complain of images jumping when he focuses hard. "He says he can do things but this slows him down." (Docket Entry No. 170-8 at 120 (AR 1422))

had been objectively verified. Plaintiff maintains that his left eye symptoms have been present since his 1989 surgery to remove an orbital mass on that side, but that they did not become vocationally significant until he lost central vision in his right eye following the 2002 surgery. Id. at 191-200 (AR 1153-1162).

In response to plaintiff's letter, Dr. Wallace wrote to plaintiff on April 1, 2010, recounting that in his last examination of plaintiff on September 8, 2008, he "did notice the eye movements and nystagmus[.]"  He went on to state as follows:

> I hope I have not been misunderstood. I did not mean to say that you did not have any problems with your right eye from the treatment of the tumor. You have a large blind spot in the right eye with a large area of loss of central vision. I am sure that this loss of central vision causes a considerable loss of depth perception and difficulties in many areas of your life every day. [] You are not legally blind because the left eye sees much better at this point. Nevertheless, with the loss of vision in one eye, and nystagmus in the other eye, it can greatly affect someone's lifestyle and someone's ability to work in many occupations. It is not my role to comment on official duties you may or may not be able to perform.

Id. at 178 (AR 1140).  Plaintiff sent this letter to Dr. Jessup, who did not disagree with Dr. Wallace's conclusions, but did not find any basis to change any recommendations he had made while treating plaintiff through 2002. (Docket Entry No. 170-6 at 169 (AR 1131))  The letter was also presented by MetLife to Dr. Weber, along with a DVD of footage plaintiff had recorded in the mirror of the eye movements and other treatment records, to obtain Dr. Weber's opinion on whether this evidence changed his previous conclusion; Dr. Weber replied that it did not, although he did not specifically address Dr. Wallace's reference to observing nystagmus. (Docket Entry No. 170-6 at 53-54 (AR 1015-1016))

Accordingly, on May 5, 2010, MetLife issued a decision relying upon, inter

alia, the assessment of Dr. Weber, and upholding its denial of LTD benefits due to any physical disability, but advising plaintiff of his administrative appeal rights. (Docket Entry No. 170-6 at 38-44 (AR 1000-1006)) After plaintiff sought further appellate review, MetLife submitted his file for review by ophthalmologist Joseph S. Goetz, M.D. Dr. Goetz relied on the fact that "Dr. Lavin considered the oscillopsia a subjective complaint that was not consistent with the patient's nystagmus," and the fact that plaintiff has not been able to tolerate medication directed to alleviating the oscillopsia, and has not sought further medical intervention for it, to conclude that plaintiff's vision-related functional limitations were attributable to his depth perception deficiency only, and that he would need to avoid working on near visual tasks which would involve very small parts or tools in addition to avoiding the use of machinery and ladders, and working at dangerous heights. (Docket Entry No. 170-4 at 98-101 (AR 563-566)) Dr. Goetz further gave explicit consideration to the Social Security Administration's decision to award plaintiff disability benefits, agreeing with the Administrative Law Judge's finding of vision-related restrictions against climbing and balancing, but disagreeing with other limitations against kneeling, crouching, crawling, or stooping. Dr. Goetz's assessment was circulated for comment among plaintiff's eye doctors of record, none of whom responded in any meaningful way.

   In its final administrative decision, MetLife relied upon the report of Dr. Goetz and the medical history described therein to find "that the medical information provided does not support continuous physical functional limitations preventing you from performing any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and predisability earnings...." (Docket Entry No. 170-3 at 13 (AR 273)) MetLife further distinguished the standard applicable to Social Security's review

of a claim to benefits.  Id.  Ultimately, MetLife upheld its May 5, 2010 decision to award LTD

benefits through October 4, 2003, on account of plaintiff's mental disability, but to terminate

them after that date.  The May 5, 2010 decision letter presented MetLife's reasoning in

greater detail than the June 2011 letter finally terminating administrative proceedings, but it

suffices to say that the evidence of plaintiff's visual symptoms and conditions as well as his

allegations of balance disturbances and multiple falls were deemed justified by his depth

perception deficiency, which also led to several work-related limitations, while the weight of

the medical evidence was deemed to not support the existence of disabling limitations from

left eye oscillopsia or other visual disturbances.  Considering the medical evidence on both

sides, including the scant references to nystagmus by Drs. Lavin and Wallace, or any

references to other objectively verifiable reasons for plaintiff's subjective complaints, the

undersigned finds that this determination by MetLife was plainly not arbitrary and

capricious.

Finally, plaintiff's motion for appointment of a special prosecutor should be

denied.


## IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that MetLife's

motion for judgment on the administrative record (Docket Entry No. 195) be GRANTED in

part and DENIED in part, that plaintiff's motion for summary judgment on the

administrative record and second request for special prosecutor (Docket Entry No. 198) be

GRANTED in part and DENIED in part, and that this case be REMANDED to MetLife for

further consideration of plaintiff's mental impairments, including, if necessary, a formal

psychiatric evaluation at MetLife's expense pursuant to the provision for same in the LTD plan.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 1st day of March, 2013.

 s/ John S. Bryant_____
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE