# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| **BARRY SCHMITTOU,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | )    Case No. 3:05-cv-0013 |
| v. | ) |
| | )    Judge Aleta A. Trauger |
| **METROPOLITAN LIFE INSURANCE** | )    Magistrate Judge Bryant |
| **CORPORATION, TMG SOLUTIONS, INC.,** | ) |
| | ) |
|     **Defendants.** | ) |

## MEMORANDUM

On March 1, 2013, Magistrate Judge Bryant issued a Report and Recommendation ("R&R") that granted in part and denied in part the respective cross-motions for judgment on the administrative record filed by defendants Metropolitan Life Insurance Corporation and TMG Solutions (collectively, "MetLife") and plaintiff Barry Schmittou. (Docket No. 216.) Schmittou has filed an Objection to the R&R (Docket No. 219), and the defendants have a filed a Response in opposition thereto (Docket No. 223.) For the reasons stated herein, the Objection will be granted in part and denied in part and both claims will be remanded to MetLife.

## BACKGROUND

The factual and procedural history of this case is explained in detail in the R&R and other previous opinions in this case. Briefly, Schmittou seeks long-term disability benefits under an ERISA-governed insurance policy for which MetLife is both the insurer and the plan administrator. MetLife initially denied Schmittou's requests for short-term disability benefits and, at least implicitly, his requests for long-term disability ("LTD") benefits pursuant to debilitating eye conditions. In an initial Report and Recommendation issued on January 30,

1

2008 (Docket No. 106), which the court ultimately accepted (Docket No. 113), the Magistrate Judge determined that MetLife had improperly failed to consider Schmittou's repeated requests for LTD benefits, that MetLife had committed numerous procedural errors in violation of ERISA, and that MetLife improperly had relied on the conclusions of a retained physician with no expertise in diseases or disorders of the eye.[1] Therefore, the court remanded Schmittou's LTD claims to MetLife for a "full and fair review." (Docket No. 113 at p. 3.)

On May 5, 2010, MetLife granted Schmittou LTD benefits for a two-year period based on his mental disability, but otherwise denied the request for LTD benefits. After Schmittou appealed, MetLife issued a final decision on June 16, 2011, in which it upheld its decision to deny LTD benefits beyond October 4, 2003. After the supplemented administrative record was refiled in this court, the parties filed cross-motions for judgment on the administrative record. (*See* Docket Nos. 195 (MetLife) and 198 (Schmittou).) For purposes of this court's review of the R&R, the parties' motions presented essentially two issues: (1) whether Schmittou suffered from a physically disabling condition that prevented him from earning more than 80% of his pre-disability earnings in "any gainful occupation" for which he was "reasonably qualified" (hereinafter, "Physical Claim"); and/or (2) whether Schmittou is "disabled" because of bipolar disorder (hereinafter "Mental Claim"). (*See* Docket No. 45, Attachment No. 1, at pp. 5 and 19.)

In the R&R at issue here, the Magistrate Judge finds that MetLife's decision to deny the Physical Claim was not arbitrary and capricious, but he finds that MetLife's decision to deny the

---

[1]The court stated that it could "fully understand [Schmittou's] frustration and lack of trust in a further determination by MetLife, given the record of this case and the magistrate judge's explicit finding of arbitrary and capricious conduct on the part of MetLife." (Docket No. 113 at p. 2.)

Mental Claim was arbitrary and capricious, thereby justifying remand to MetLife for further proceedings concerning the Mental Claim only. The Magistrate Judge also recommends denial of Schmittou's separate request for appointment of a special prosecutor. (*See* Docket No. 162.)

Schmittou has filed an Objection to the R&R, in which he argues that the Magistrate Judge erred by (1) recommending remand of the Mental Claim rather finding that Schmittou was clearly entitled to benefits; (2) recommending judgment for MetLife on the Physical Claim, and (3) recommending denial of his request for appointment of a Special Prosecutor.

This court must review *de novo* any portion of the R&R to which a specific objection is made. Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1)(c); *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001); *Massey v. City of Ferndale*, 7 F.3d 506, 510 (6th Cir. 1993). Schmittou's Objection to the R&R is a 220-page document that contains a mixture of general complaints about a variety of topics unrelated to consideration of the R&R (*see, e.g.*, Objection at p. 15 (arguing that CNA insurance had illegally denied insurance coverage to a wounded civilian contractor "whose leg was blown up in a war zone")) and arguments specific to the R&R (*see, e.g.*, *id.* at p. 47 (arguing that Judge Bryant failed to consider Schmittou's arguments regarding MetLife's purported reliance on a vocational assessment in denying the Physical Claim)). Although separating the wheat from the chaff in Schmittou's submission certainly requires extra effort, the court finds that Schmittou's Objection contains sufficiently specific objections to justify *de novo* review of the R&R's findings and recommendations, particularly where Schmittou is proceeding *pro se*, and where Schmittou suffers from diagnosed mental illness.[2]

---

[2]Indeed, even MetLife's Response to Schmittou's Objection identifies several specific objections articulated by Schmittou. (*See, e.g.*, Response at p. 6 ("Plaintiff also objects that Magistrate Judge Bryant did not give any weight or show any consideration to any potential

3

The court will deny the request for a special prosecutor for the reasons stated in previous opinions. (*See* Docket Nos. 144, 153, and 162.) However, Schmittou has raised potentially viable objections regarding his claims for LTD benefits, which the court will analyze separately.

## ANALYSIS

**I.  Legal Standard**

MetLife has discretionary authority to interpret and apply the benefit plan provisions in question. Therefore, "the highly deferential arbitrary and capricious standard of review is appropriate." *Judge v. Metro. Life Ins. Co.*, — F.3d —, 2013 WL 1188067, at *4 (6th Cir. Mar. 25, 2013) (submitted for publication) (quoting *Borda v. Hardy, Lewis, Pollard & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998)). "A plan administrator's decision will not be deemed arbitrary and capricious so long as 'it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome.'" *Judge*, 2013 WL 1188067, at *4 (quoting *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004)).

In undertaking its analysis, the court must review "the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006) (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)). The benefits determination must be upheld if it is rational in light of the plan's provisions. *Judge*, 2013 WL 1188067, at *4. The administrator's decision must be the result of a principled reasoning process and supported by substantial evidence. *Helfman v. GE Grp. Life Assur. Co.*, 574 F.3d 383, 392 (6th Cir. 2009). Also, "[t]he court's review of the decision of a plan administrator is limited to the administrative record; that is, [the

---

conflict of interest.")

court is] 'required to consider only the facts known to the plan administrator' at the time of the decision." *Id.* (quoting *Yeager v. Reliance Std. Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996)).

Here, MetLife is both the insurer and the administrator under the plan. "[A] conflict of interest exists for ERISA purposes where the plan administrator evaluates and pays benefits claims, even when, as here, the administrator is an insurance company and not the beneficiary's employer." *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 445 (6th Cir. 2009). The weight afforded to the conflict of interest can vary according to case-specific factors. *See Metro Life. Ins. Co. v. Glenn*, 554 U.S. 105, 117, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008); *Borda*, 139 F.3d 1062, 1069 (6th Cir. 1998); *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 311-12 (6th Cir. 2010) (citing *Glenn*, 554 U.S. at 114) ("[S]uch a conflict is a red flag that may trigger a somewhat more searching review of a plan administrator's decision, but the arbitrary and capricious standard remains in place.")

## II.     **Mental Claim**

The Magistrate Judge found that MetLife acted arbitrarily and capriciously in denying the Mental Claim. Before making its final determination, MetLife had received a letter from Schmittou's treating psychologist Dr. Susan Carpenter, who expressed, in most relevant part, that Schmittou had experienced "a series of major stresses which either triggered the development of a bipolar disorder or destabilized an already existing bipolar disorder."[3] (AR 300-303.) MetLife's consulting psychiatrist, Dr. Lawrence Osborn, broadly agreed with Dr.

---

[3] The administrative record is contained at Docket Nos. 45 (pre-remand) (AR-0001 to AR-0265) and 170 (post-remand) (AR-0266 to AR 1747). For ease of reference, the court will refer to the administrative docket entries as "AR-XXXX," reflecting the designations utilized by the parties.

5

Carpenter's assessment and stated that "[a] psychiatric evaluation would be strongly recommended at this point, with a question posed about the possible substantiation of a Bipolar Illness diagnosis, and it is possible that such an evaluation would find the clinical basis for a Bipolar diagnosis."  (AR 280-282.)  Under the Plan, MetLife had the right to refer Schmittou for this recommended formal psychiatric evaluation.  Nevertheless, MetLife denied Schmittou's Mental Claim without conducting the formal psychiatric evaluation "strongly recommended" by its own psychiatrist and without addressing Dr. Carpenter's updated opinion letter.

Schmittou argues that the court should reverse MetLife's determination of the Mental Claim and award him LTD benefits, rather than remand the claim for further proceedings.  The record certainly demonstrates that Schmittou suffers from mental illness, perhaps including bipolarity.  The record also establishes that, as the Magistrate Judge found, MetLife did not engage in a deliberate, principled reasoning process with respect to its final denial of the Mental Claim.  However, the court also agrees with the Magistrate Judge that the record does not contain sufficient information to demonstrate that Schmittou is clearly entitled to benefits under the Mental Claim.  Under these circumstances, the court is obligated to remand the claim for further proceedings.  *See Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622 (6th Cir. 2006).

### III. Physical Claim

There appears to be no dispute that Schmittou essentially can see only with his left eye, *i.e.*, that he is "monocular."  A key issue presented in the claims process was whether Schmittou has sufficient vision in his left eye to enable to him work at jobs for which he is otherwise qualified.

Schmittou underwent left orbital surgery in 1990 to remove a cyst from his eye socket,

6

which resulted in orbital defects. In 2001, Schmittou began repeatedly complaining about various vision problems. In 2002, Schmittou had a potentially cancerous lesion removed from his right eye, which has left him essentially blind in that eye. Subsequent to that surgery, Schmittou complained to his treating physicians that he suffered from a host of adverse vision symptoms in his left eye, including, *inter alia*, image jumps, seeing images that are not there, inability to focus, eye "pulsing," and involuntary oscillations of the left eye.

One of these physicians, neuro-ophthalmologist Dr. Patrick Lavin, examined Schmittou between September 2004 and June 2005. On October 11, 2004, Lavin diagnosed Schmittou with "[o]scillopsia – no specific pattern" and a "[v]ery fine subtle downbeat nystagmus" that was "worse in the left eye and worse on lateral gaze".[4] (AR 1419.) Lavin noted that "the pattern of his oscillopsia is not typical of downbeat nystagmus" and that he "could find no obvious underlying cause for his downbeat nystagmus." (*Id.*) On December 2, 2004, Lavin noted that Schmittou had 20/15 vision in the left eye, but again noted that "he had very fine downbeat nystagmus worse in the left eye and worse on lateral gaze . . . ." (AR 1421.) Again, he diagnosed Schmittou with "Oscillopsia – with no specific pattern" and "[v]ery fine subtle downbeat nystagmus." With respect to the nystagmus, he "can still find no obvious underlying cause," but he stated that, "if [Schmittou] has some underlying cerebellar disorder time will tell." (*Id.*) On June 2, 2005, Dr. Lavin noted that Schmittou had 20/20 visual acuity in the left eye and that he "did not detect downbeat nystagmus" on that particular day. (AR 1422.) However,

---

[4]Oscillopsia is the subjective sensation of objects viewed – *i.e.*, oscillating vision. *See* Stedmans Medical Dictionary, Stedmans 278670 (27th ed. 2000). Nystagmus is an involuntary rhythmic oscillation of the eyeballs, either pendular or with a slow and fast component. *Id.*, Stedmans 278640.

7

Lavin also stated that Schmittou "had a few cycles of *upbeat* nystagmus." (*Id.*) (emphasis added).) He also again diagnosed Schmittou with "[o]scillopsia – with no specific pattern." (*Id.*)

On August 11, 2008, MetLife initially denied the claim, based in part on a June 13, 2008 report prepared by Dr. George M. Yanik (AR 1735-1741), which concluded that Schmittou was simply monocular with high visual acuity in the left eye.[5] In most relevant part, Dr. Yanik did not review or address Dr. Lavin's diagnoses of Schmittou in 2004 and 2005. Therefore, Dr. Yanik's report contained no acknowledgment that at least one treating physician had identified nystagmus and oscillopsia in Schmittou's left eye, let alone any consideration of the practical effects of those conditions.

According to an April 1, 2010 letter from another of Schmittou's treating ophthalmologists, Dr. Trent Wallace, Dr. Wallace had diagnosed Schmittou with nystagmus at least as of September 2008. In most relevant part, Dr. Wallace's letter stated as follows:

> When I last saw you on September 8, 2008, your vision was count fingers in the right eye and 20/25 in the left eye. . . .
>
> In the left eye, the macular region was healthy and the retina was completely attached. *I did notice the eye movements and nystagmus in 2008.*
>
> I hope I have not been misunderstood. I did not mean to say that you did not have any problems with right eye from the treatment of the tumor. You have a large blind spot in the right eye with a large area of loss of central vision. I am sure that this loss of central vision causes a considerable loss of depth perception and difficulties in many areas of your life every day.
>
> You are not legally blind because the left eye sees much better at this point.

---

[5]MetLife consulted with Dr. Yanik, who prepared his report based on a limited "file-only" review and discussions with two of Schmittou's treating physicians. Notably, Dr. Yanik did not review any clinical records dated later than November 5, 2004, nor did he review (let alone address) Dr. Lavin's 2004 and 2005 diagnoses of Schmittou.

> Nevertheless, with the loss of vision in one eye, *and nystagmus in the other eye*, *it can greatly affect someone's lifestyle and someone's ability to work in many occupations*. It is not my role to comment on official duties you may or may not be able to perform.

( AR 1146 (emphases added).)

After Schmittou appealed, MetLife consulted with, *inter alia*, opthalmologist Dr. Alan Weber, who conducted a file review and contacted Schmittou's treating physicians. Dr. Weber's initial report (AR 1221-1227) states that Weber spoke on the phone with Dr. Wallace about Schmittou's conditions. Dr. Weber does not reference any discussion concerning Schmittou's left eye but, instead, notes that Dr. Wallace stated that "the source and mechanism of the patient's symptoms is a 'troubling case for him' [*i.e.*, Dr. Wallace]" and that "we agreed that this was a case of subjective complaints without objective findings." Dr. Weber's report also recites Dr. Lavin's diagnoses in an "Assessment" section, but Dr. Weber's analysis fails to account for Dr. Lavin's diagnoses in purporting to determine Schmittou's physical limitations. Dr. Weber describes Schmittou's medical condition as "loss of vision in right eye," without any mention of the nystagmus and/or oscillopsia observed by Dr. Wallace and Dr. Lavin in the left eye. Dr. Weber's analysis states that "the monocular status of Mr. Schmittou would not preclude him from his usual and customary work as a national field manager including driving a motor vehicle," and he concludes that "the clinical data suggests only restriction [sic] for the applicant is to avoid using heavy equipment, operation of power tools, and climbing ladders to heights which might be a danger to himself."

MetLife purports to have circulated Dr. Weber's report to Schmittou's retained physicians on February 9, 2010 for comment by February 16, 2010, although at least one treating physician appears not to have received the report within that time frame. (*See* AR 1232 (2/16/10

9

letter from James R. Head, M.D., stating that "[m]y office has not received any information from MetLife concerning patient [Schmittou].""))

The one physician who did provide a meaningful response was Dr. Wallace. On April 1, 2010, Dr. Wallace sent to Schmittou the letter described above, which became part of the administrative record. As noted above, Dr. Wallace's account appears to contradict or at least supplement Dr. Weber's recitation of the substance of Dr. Wallace's diagnoses in September 2008, in which Dr. Wallace had observed eye movements and nystagmus in Schmittou's left eye.

On April 29, 2010, Dr. Weber issued a supplemental report. (AR 1015-1016.) The report indicates that Dr. Weber reviewed additional clinical notes from another treating physician, a cassette tape of a conversation between Schmittou and a manager at Schmittou's former employer, and a DVD allegedly showing the "right eye" of Schmittou.[6] Notably, Dr. Weber did not review, let alone address, Wallace's April 1, 2010 letter. Based on the additional materials that he did review, Dr. Weber stated that his conclusions were unchanged. However, Dr. Weber stated that "the clinical information *suggests necessity of follow-up evaluations* with Patrick J. Lavin, M.D., neuro-ophthalmologist at Vanderbilt University Medical Center." (AR 1016 (emphasis added).)

Based on the physical limitations articulated in Dr. Weber's first report, a vocational consultant prepared an "Employability Assessment" (AR 1216-1218), in which she determined that (1) Schmittou was qualified and able to perform several occupations that would earn more than 80% of his pre-disability pay, and (2) sufficient jobs in these fields were available in the Middle Tennessee area for Schmittou to secure gainful employment.

---

[6]Schmittou has vehemently insisted that the video shows his *left* eye, not his right eye.

On May 5, 2010, MetLife issued a denial letter, which selectively quoted from the administrative record. (AR 1000-1006.) With respect to Dr. Wallace's April 1, 2010 letter, MetLife noted that Dr. Wallace had found that, with regard to the left eye, "the macular region was healthy and the retina was completely attached, and your vision was 20/25" but conspicuously omitted Dr. Wallace's diagnoses of eye movements and nystagmus in the left eye, as well as his statements that the right eye blindness combined with the left eye nystagmus would likely impact Schmittou's daily life and his ability to work. MetLife's denial also made no mention of Dr. Lavin's observations of both downward nystagmus, upward nystagmus, and oscillopsia in the left eye in 2004 and 2005. Furthermore, MetLife stated that Dr. Head "did not feel comfortable sharing any medical opinions," but made no mention of the fact that Dr. Head stated that he had not received any information from MetLife in the first place.

After Schmittou filed a second and final appeal, MetLife consulted with ophthalmologist Dr. Joseph S. Goetz, who prepared a report apparently based on a file-only review that did not include any further discussions with Schmittou's treating physicians. (AR 0523-AR056.) Dr. Goetz's report does not acknowledge, let alone address, Dr. Wallace's September 2008 observations of eye movements and nystagmus in Schmittou's left eye. With respect to Dr. Lavin's observations, Dr. Goetz recites Dr. Lavin's diagnoses but does not explain why he (Dr. Goetz) chooses not to factor the potential oscillopsia and nystagmus into his conclusions about Schmittou's current physical limitations. Notably, Dr. Goetz's report states that, in addition to the limitations noted by Dr. Weber, "working on near visual tasks which involve very small parts or tools would be difficult." (AR 0524.)

On June 16, 2011, MetLife issued its final denial letter. With respect to the Physical

11

Claim, it largely relied on Dr. Goetz's report. In a carefully worded paragraph, it also stated that "we had a vocational rehabilitation consultant review your file and your visual limitations discussed. The vocational rehabilitation consultant reviewed the Employability Analysis and Labor Market Analysis performed in March 2010. Based on your training, education, and experience, along with physical limitations, you were/are able to perform alternate occupations and meet gainful wage." (AR 271.) In reality, it appears that MetLife relied on the initial Employment Analysis without updating it to incorporate the additional visual limitations articulated by Dr. Goetz. It is not clear whether the additional limitations would have impacted the results of that analysis.

The court is, once again, troubled by MetLife's handling of the Physical Claim. Although MetLife seems to have undertaken more steps in the administrative process than it did before remand, including retaining board-certified physicians to analyze the record, the court still perceives multiple process violations. First, as with MetLife's handling of the Mental Claim, MetLife has either ignored or failed to adequately address evidence that would favor an award of LTD benefits to Schmittou. It was inexcusable for MetLife not to present Dr. Wallace's observations to its retained ophthalmologists Dr. Weber and Dr. Goetz. As a consequence, neither Dr. Weber nor Dr. Goetz considered the impact of Dr. Wallace's observations of nystagmus and eye movements in September 2008, or Dr. Wallace's stated impression that the right eye combined with the left nystagmus would impact Schmittou's daily life and ability to work. Ultimately, with respect to Dr. Wallace's April 1, 2010 letter, MetLife simply cherry-picked Dr. Wallace's observation that Schmittou had 20/25 visual acuity in the left eye, creating the misleading impression that Dr. Wallace had not observed other potentially

12

debilitating conditions in the eye.  Similarly, although MetLife's physicians summarize Dr. Lavin's 2004 and 2005 observations of nystagmus and oscillopsia, they do not explain why they choose to discount those observations in their respective analyses, particularly where those observations appear to have been corroborated by Dr. Wallace several years later.[7]

Second, without conducting a physical examination of Schmittou, MetLife's physicians implicitly discredited both the observations of Schmittou's treating ophthalmologists and Schmittou's subjective complaints (and they are legion) of multiple serious visual impairments that would adversely impact his ability to work.  As the Sixth Circuit has acknowledged, "the failure to conduct a physical examination – especially where the right to do so is specifically reserved in the plan – may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination."  *Helfman*, 573 F.3d at 393 (quoting *Calvert v. Firstar Fin. Inc.*, 409 F.3d 286, 296 (6th Cir. 2005)).  Furthermore, the Sixth Circuit has found that this factor is particularly important where, as here, the plan administrator's retained medical experts conduct a "file only" review that explicitly or implicitly finds that a beneficiary's claims are not credible. *See Bennett v. Kemper Nat. Servs., Inc.*, 514 F.3d 547, 555 (6th Cir. 2008).  Here, even Dr. Weber acknowledged the "necessity of follow-up" (*i.e.*, a physical examination) concerning Schmittou's visual impairments.

Third, without explanation, MetLife's consulting opthalmologists and MetLife have essentially treated the presence of (approximately) 20/25 visual acuity in Schmittou's left eye as establishing that only the right eye impairments are relevant to an assessment of his visual

---

[7]Furthermore, neither MetLife nor MetLife's consulting physicians address whether there is a potential relationship between Schmittou's left eye surgery in 1990 and the left eye symptoms that Dr. Lavin and Dr. Wallace observed between 2004 and 2008.

limitations. However, it may be that nystagmus and oscillopsia in the left eye would impact Schmittou's ability to work in jobs for which he is otherwise qualified, notwithstanding the fact that he has 20/25 visual acuity.

Fourth, the record contains some additional process violations, including MetLife's failure to update the vocational assessment to reflect the additional limitations articulated by Dr. Goetz, and MetLife's apparent failure to provide Dr. Weber's report to one of Schmittou's treating physicians, Dr. Head, within the promised time frame.

Fifth, in light of the continued process violations, which have occurred both before and after remand, the court is concerned that MetLife's inherent conflict of interest has been playing a motivating factor in MetLife's decision-making process with respect to both claims.

In light of these circumstances, the court finds that MetLife's decision to deny the Physical Claim was arbitrary and capricious. MetLife cannot avoid benefits through (for lack of a better term) "willful blindness."[8] However, the court does not construe the existing record as establishing that Schmittou is clearly entitled to LTD benefits for the Physical Claim. Therefore, as with the Mental Claim, the court will remand the Physical Claim to MetLife for further proceedings consistent with this opinion.

---

[8]If MetLife and its retained physicians challenge the credibility of the symptoms previously observed by MetLife's physicians and of which Schmittou has repeatedly complained, they are obligated to provide a meaningful explanation why those symptoms should be disregarded. Moreover, given the staleness of much of the information concerning Schmittou's visual impairments and clinical diagnoses of multiple conditions in his left eye (nystagmus and oscillopsia), it is difficult to understand how MetLife could reach a reasoned, principled decision to deny the Physical Claim without either (a) analyzing a contemporaneous diagnosis from a treating physician, and/or (b) referring Schmittou for an independent medical examination at MetLife's own expense. The court shares the same concerns with respect to the Mental Claim, for which MetLife's own retained physician "highly recommends" a psychiatric evaluation.

## IV.     Additional Comment

Schmittou has engaged in a commendable effort to prosecute his disability claims on his own behalf.  His efforts have now caused the court to remand his case twice for further proceedings.  However, Mr. Schmittou is reminded that whether he is entitled to LTD benefits will likely turn on objective sources of data – such as clinical diagnoses and/or the results of a physical and/or psychiatric examination – not on his subjective complaints to MetLife's claims processing department, governmental agencies, and anyone else he believes has an interest in the outcome here.  The court is already well aware of these complaints, which, for what they are worth, are contained in the administrative record and Schmittou's briefs to this court – often multiple times.  Repeating these allegations will not materially advance Schmittou's claims.  Instead, Schmittou should permit MetLife to administer the claims in a reasonable and principled manner, which the court trusts it will do at this point.  On a final note, the court once again strongly advises Schmittou to secure counsel to represent him further in this matter before MetLife and, if necessary, before the court after remand.

## CONCLUSIONS

For the reasons stated herein, Schmittou's Objection to the R&R will be sustained in part and overruled in part, the R&R will be accepted in part and rejected in part, Schmittou's Motion for Judgment on the Administrative Record and Request for Special Prosecutor will be granted in part and denied in part, and MetLife's Motion for Judgment on the Administrative Record will be denied.  The case will be remanded to MetLife for further proceedings consistent with this opinion.  Schmittou's request for appointment of a special prosecutor will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge